

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

DAVID WAYNE BOSWELL, §
 §
    Petitioner, §
 §
v. § No. 4:16-CV-729-A
 §
LORIE DAVIS, Director, §
Texas Department of Criminal §
Justice, Correctional §
Institutions Division, §
 §
    Respondent. §

## MEMORANDUM OPINION
## and
## ORDER

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, David Wayne Boswell, a state prisoner incarcerated in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against Lorie Davis, director of TDCJ, respondent. After having considered the pleadings, state court records, and relief sought by petitioner, the court has concluded that the petition should be denied.

## I. Procedural History

In April 2011, petitioner was indicted in Comanche County, Texas, Case No. CR-03371, for aggravated assault with a deadly weapon. (Clerk's R. at 3.) Following a jury trial, the jury found petitioner guilty and assessed his punishment at 8 years' confinement. (Id. at 62.) Petitioner's conviction was affirmed on appeal, the Texas Court of Criminal Appeals refused his petition

for discretionary review, and the United States Supreme Court denied writ of certiorari. (Paper Record.) *Boswell v. Texas*, --- U.S. ---, 137 S. Ct. 1427 (2015). Petitioner also filed a state postconviction application for writ of habeas corpus challenging his conviction, and raising the claim presented in this federal petition, which was denied by the Texas Court of Criminal Appeals without written order. (State Habeas R.[1] at 14 & Action Taken.)

The state appellate court summarized the evidence in the case as follows:

> [Petitioner] arrived at Randy and Kristy Burns's property in the afternoon to drop off the bed of a pickup. [Petitioner]'s wife—Tiffany Boswell (Boswell)—and their children were already on the property when [petitioner] arrived. Charles Fonville, whom [petitioner] had met once or twice before, and Mason Jade Warren, who is Boswell's first cousin, arrived in the evening. The men spent the late afternoon and evening in Randy's shop, drinking alcohol, while the women spent most of their time inside the Burnses' home. Some of those present testified that Fonville and [petitioner] had disagreements that created tension while they were in the shop and when everyone was inside the Burnses' home. Kris and Kristin Scitern arrived later at the Burnses' property.
>
> Around 10:00 p.m., Fonville and Warren left the property in Fonville's pickup, but they returned shortly. [Petitioner] testified that, when Fonville and Warren returned, [petitioner] and Boswell had gathered their children and were about to leave. [Petitioner] saw Kris Scitern approach Fonville's pickup and have a brief discussion with Fonville and Warren. [Petitioner] knew that Warren did not like him because they had been in an altercation at a previous party.

---

[1] "State Habeas R." refers to the state court record of the state habeas proceedings in WR-85,183-02.

After Kris backed away from the pickup, [petitioner] saw Warren get something from the back of Fonville's pickup. [Petitioner] said that Fonville and Warren approached him and that Fonville said, "I'll bet you can't whip me and my little friend here." As they approached, Warren was holding a shovel, and Fonville was holding something in his left hand, although [petitioner] could not identify the item at the time. At that point, Fonville jabbed at [petitioner], and the two of them struggled with each other to the ground.

[Petitioner] grabbed at Fonville's wrist and was cut in the hand by the object Fonville was holding. As [petitioner] wrestled with Fonville to take control of the object that had cut him, Warren hit [petitioner] over the head with the shovel. The shovel blows caused multiple gashes in [petitioner]'s head, and he bled profusely. Eventually, [petitioner] escaped, walked away from the altercation, told Boswell to call 911, got in his pickup, and drove away toward the hospital.

Boswell also testified on [petitioner]'s behalf. Boswell said that she was present during the altercation between Fonville and [petitioner] and that, after [petitioner] yelled at her to call 911, she drove to get help because she could not get cell phone reception. Boswell found Billy Carson, a Gorman police officer, and told him that a fight was taking place. Officer Carson followed her back to the Burnses' property. By the time Boswell and Officer Carson arrived, [petitioner] had left the scene.

The remaining witnesses testified against [petitioner]. According to their version of the events, Fonville, while in the Burnses' shop, disapproved of [petitioner]'s boasts about the towing capacity of [petitioner]'s pickup. These witnesses claimed Boswell had left with her children and did not see the fight between [petitioner], Fonville, and Warren. They also said that Fonville and Warren left the Burnses' property to get ice but returned to the Burnses' property after they discovered the store was closed. Once Fonville and Warren had returned to the Burnses' property, [petitioner] and Fonville exchanged words, and [petitioner] approached Fonville with a knife in his hand. [Petitioner] walked toward Fonville, and the two of them wrestled to the ground; almost immediately, the witnesses saw large pools of blood coming from

3

>     his hand. [Petitioner] walked toward Fonville, and the
>     two of them wrestled to the ground; almost immediately,
>     the witnesses saw large pools of blood coming from
>     beneath Fonville on the ground. Someone yelled that
>     [petitioner] was killing Fonville, so Warren retrieved
>     a shovel from the back of Fonville's pickup and hit
>     [petitioner] several times in the head to break up the
>     fight. Randy Burns testified that, during the scuffle,
>     he stepped on [petitioner]'s hand and took the knife
>     away. [Petitioner] then got off Fonville and fled the
>     scene in his pickup while Fonville was on the ground
>     bleeding from the stab wounds. Warren called 911, and
>     Fonville was later taken in an ambulance to a hospital.

(Mem. Op. at 2-4.)

## II. Issues

In one ground, petitioner claims that his trial counsel was ineffective because counsel "labored" under an actual conflict of interest by simultaneously representing petitioner and Warren, one of the state's key witnesses. (Pet'r's Mem. at 13.)

## III. Rule 5 Statement

Respondent believes that the petition is timely filed, that the petition is not successive, and that petitioner has sufficiently exhausted his state-court remedies as to his claim. (Resp't's Answer at 6.) 28 U.S.C. §§ 2244(b), (d) & 2254(b)(1).

## IV. Discussion

*A. Legal Standard for Granting Habeas Corpus Relief*

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state

4

unreasonable application of clearly established Supreme Court precedent or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington,* 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000). Further, when the Texas Court of Criminal Appeals denies a federal claim in a state habeas-corpus application without written opinion, a federal court may presume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary" and applied the correct "clearly established federal law, as determined by the Supreme Court of the United States" unless there is evidence that an incorrect standard was

5

applied, in making its decision. *Johnson v. Williams,* 568 U.S. 289, 298 (2013); *Harrington,* 562 U.S. at 99; *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2003).

Because petitioner fails to present clear and convincing evidence rebutting the state habeas court's factual findings, this court defers to those findings in the discussion below. 28 U.S.C. § 2254(e)(1).

B. *Ineffective Assistance of Counsel*

Petitioner claimed in his state habeas application, as he does now, that due to counsel's simultaneous representation of both Warren and himself, counsel did not impeach Warren's testimony with evidence of his reputation for truthfulness and his criminal history, despite ample evidence with which to do so. (Pet. at 6.) In support, petitioner presented the affidavit of Warren's aunt, in which she avers:

> Mason Jade Warren is my nephew. His father, who has passed on, was my brother. I have known Jade since he was born. My brother and his family lived less than two miles away from my home and we spent time together on a regular basis as the kids grew up.
>
> Although he has never acted out towards me, I have always felt that Jade had a bitter attitude towards others. Others in my family agreed[.] As he grew older, it became more apparent but I felt the chip on his shoulder grew larger after his mother died. This occurred when he was in high school.
>
> I did not personally observe him lose his temper but was told by family members that on more than one occasion he got into confrontations with others at his son's little league games in DeLeon Park and was even requested to leave the park.

> Family members have also told me that he and a
> girlfriend split up because he was physically abusing
> her. Family members have also discussed his arrest for
> a DWI incident. I am unaware of details but have been
> told he had other run-ins with law enforcement.
>
> On one occasion, I was leaving the grocery store in
> Gorman as Jade and his son were entering the store. We
> spoke and he began to tell me about the events that
> occurred in March of 2011 at the Burns residence where
> he had been involved in a physical fight with David
> Boswell.
>
> He basically told me his side of the story but during
> the conversation he stated, "I should have done the
> family a favor and killed the SOB!" referring to David
> Boswell.
>
> If I was called to testify in this case I would have
> appeared and I would have testified that Mason Jade
> Warren has a bad reputation in the community in which
> he lives for truthfulness and for peacefulness and I
> would have testified that I am familiar with that
> reputation.

(State Habeas R. at 96.)

In his own affidavit, counsel responded to petitioner's allegation as follows:

> I did at one time represent a witness by the last name
> of Warren on a misdemeanor driving while intoxicated
> charge in Comanche County, which was completely
> unrelated in any way to the aggravated assault charge .
> . . on this particular night. And again, I do not have
> the record, but I believe I cross examined Warren
> intensely in an effort to impeach his testimony. I had
> in fact withdrawn from representing Warren several
> months prior to Boswell's trial because Warren did not
> pay his bill for my services rendered. I had no other
> relationship with him other than briefly representing
> him on an entirely unrelated case.

(State Habeas R. at 120.)

The state habeas court credited counsel's testimony

7

concerning the status of his professional relationship with Warren and found that Warren's conviction for misdemeanor DWI occurred on the same day he testified in petitioner's trial. (*Id.* at 156.) Based on its findings, the court entered the following legal conclusions:

> [Petitioner]'s evidence does not demonstrate that his trial counsel had an actual conflict of interest because of his earlier representation of Warren, a State's witness. The evidence does not show that [counsel] was required to make a choice between [petitioner]'s interest in a fair trial or advancing other interest to [petitioner]'s detriment. As to his counsel's failure to impeach Warren with the DWI conviction – the conviction was a misdemeanor, not a felony and not even final on the day Warren testified.

(*Id.* at 158.)

To prevail on his ineffective-assistance-of-counsel claim, petitioner must show that counsel was acting under the influence of an actual conflict of interest, as opposed to merely a potential or hypothetical conflict, that adversely affected his performance at trial. *See Cuyler v. Sullivan,* 446 U.S. 335, 348-50 (1980); *Strickland v. Washington,* 466 U.S. 668, 692-93 (1984). "[T]he cross-examination of a current or former client can be a conflict of interest. *Perillo v. Johnson,* 205 F.3d 775, 802 (5th Cir. 2000). Relevant factors to be considered in determining whether a conflict exists include:

> (1) whether the attorney has confidential information that is helpful to one client but harmful to the other client; (2) whether and how closely related is the subject matter of the multiple representations; (3) how close in time the multiple representations are; and (4)

whether the prior representation has been unambiguously terminated.

*United States v. Burns,* 526 F.3d 852, 856 (5th Cir. 2008). Furthermore, when a petitioner's claim is premised solely upon what counsel failed to do on his behalf, the petitioner must generally establish adverse effect by demonstrating that there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict. *Perillo,* 205 F.3d at 807.

Applying the appropriate deference to the state court's factual findings, the state courts' rejection of petitioner's argument that counsel was laboring under an actual conflict of interest arising from his simultaneous representation of both petitioner and Warren is not contrary to, or an unreasonable application of, clearly established federal law. Counsel's representation of Warren was brief, involved completely unrelated charges, and was terminated several months before petitioner's trial. There is no indication that counsel bore any residual loyalty to Warren or that counsel was forced to forfeit a defense strategy in petitioner's case based upon the representation. In fact, the record reflects that counsel did attempt to impeach Warren's credibility on cross-examination. (Reporter's R., vol. 4, at 123-40.)

For the reasons discussed herein,

The court ORDERS that petitioner's petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied. The court further ORDERS that a certificate of appealability be, and is hereby, denied, as petitioner has not made a substantial showing of the denial of a constitutional right.

SIGNED November 22, 2017.

_____
JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE